And we move to the third case this morning, Foster v. Principal Life Insurance Company. Good morning, Your Honor. Apparently, nobody cares about your case. Or you're not religious enough, as Judge Bowers. We care. Oh, that's good. Speak for yourself. Okay. Good morning, Your Honor. I'm Francis Foster. I'm representing Francis Foster. And it's very nice to be here as an attorney. I don't know, as being an appellant, it's that great. But anyway, what I thought I would do is start with, you know, just to answer, it's not really a legal question, but you might be curious, is why does PACE have all these plans? Why does the PACE Suburban Bus Division have all these plans? And it's somewhat rooted in history that, you know, the RTA created the PACE Suburban Bus Division, and in some cases there was a bus operation. It might have even been run privately in Oak Lawn. There might have been a bus operation in Aurora, which is, I think, PACE River, and so forth. So it was bringing together all these bus companies. Exactly. These were all acquired by PACE, and now PACE runs them all. But whatever union was in place at the time is retained. So that takes care of that. Could I start you out, because you don't have all that much time, and I really have some questions, because I'm trying to figure out what exactly was principals' role in all of this. In other words, who hired principals? What funds did principals use to pay you, Mr. Forster? Great question. Who controlled those funds? Forgive me, but clearly principal is not using its own funds. So who had the legal authority to order principal to stop payment? The legal authority to stop payment could only have come from the plan committee. The plan committee are the trustees of the trust, and they are the only ones that could have ordered principal to stop paying me. As to what principal actually does, principal is called like a limited trustee, to do duties such as recordkeeping and allocate the funds amongst participants, those kinds of duties. And the plan committee hired principal just like the plan committee hired me. The plan committee pays principal out of the trust funds, which are actually the employees' money, just like they do with me. We are both paid from the trust funds, and in reality we represent the employees rather than pays. The plan committee is the plan committee of the trust fund? Yes. Yeah, that's unique to as long as you're there. Let me just talk about that. This case is really governed by the Internal Revenue Code. You've had a lot of these kind of cases today. It's surprising. But when we talk about 401K plans, that's 401K of the Internal Revenue Code, and it's covered by all the provisions for qualified plans under Section 401. Now, the very first section of 401 defines what a qualified plan is, and a qualified plan includes a 401K plan. The very first sentence says, requirements for qualification, a trust created or organized in the United States and forming part of a stock, bonus, pension, or profit sharing, and a 401K is a type of profit sharing plan, of an employer for the exclusive benefit of the employer's employees or their beneficiaries. That's what constitutes a qualified trust. In this case, it just seems like nobody followed my allegations is the problem. I alleged that all these things, that only the plan committee could terminate me. I alleged that PACE had no powers to terminate me. I alleged it on and on and on. And unfortunately, the court, she understood my allegations. She said, Foster alleged that he could not be lawfully terminated without the participation and support of the union plan committee members. Who can fire you? Who can fire me? The plan committee. Only? Only the plan committee. Majority vote? It would have to be unanimous. That's the nature of jointly administered plans. You have representatives from PACE, and you have representatives from the union. Attorney-client relationship, however, is very personal. And as I understand it, it can be severed at almost any time by either party. Right. The plan committee could terminate me at will. But why is it unanimous? Oh, I'm just talking about the plan committee itself. It's only two people. Oh. So the two of them have to agree? Yeah. If one of them disagrees, you hang on there? Exactly. So what's the structure of PACE? I mean, I understand PACE was brought out of all these suburban bus companies. What's the corporate structure of PACE? PACE is a municipal corporation. It's sort of like you could almost describe it as like a subsidiary of the RTA. You know, you've got the RTA, and then you've got PACE, CTA, and Metro, and they're all three are municipal corporations. Could we consider the settlement for PACE for a moment? Because, of course, I understand that the terms are confidential. But if the settlement fully compensated you for your injuries, what additional recovery could be obtained on principle? See, it would seem to me that we would have to know whether you were already fully compensated unless, I guess, there would be some additional harm caused by principle for which you weren't compensated in the PACE settlement. I was not fully compensated. Okay, so it was short of? Yeah. Okay. Absolutely short. So, I mean, what actually happened is that the planned committee trustees completely lost control of the situation. They had no way of paying me. I tried to represent them. For 17 months, I represented them. But eventually, you know, they couldn't do it anymore. And the only way principle would release the funds is if PACE told them instead of the planned committee, which is totally contrary. Who was your employer? Was it the plans or the planned committee? Well, the plan is a trust, and the planned committee are the trustees. And so, you know, you could say I'm employed by the trust, or you could say I'm employed by the trustees. It's the same thing. Who did you have a contract with? The plan. The trust. The trust. Yeah. The plan. Every plan's a trust. In this area, you know, the popular name is plan. But every plan's a trust. It's required to be a trust under the Internal Revenue Code. Okay. So, okay. You see, your claim doesn't fit comfortably in the tortious interference framework because you seem to be arguing that the planned committee hired you, directed principle to pay you. Then principle stops paying you, which destroys your relationship with the planned committee. Why not just go to the planned committee and say, your agent has stopped paying me, paying me some other way? See, I don't. They have no other way. Principle controls all the funds. I mean, you're right in a way. I mean, I could have went to these. These plans don't have any money to get in big legal disputes, but I could have gone to the plans or the, let's call them plans. They're trust, but they're plans. I could have said, look, you're breaching your contract with me. You know, you got to pay me or I'm going to sue you. And then, but because of what the judge noticed, you know, because they need unanimous consent to do everything, you know, nothing's going to happen. As long as the PACE planned committee member refuses to pay the fees, then there's a stalemate. Who issues a check? Do you get a check signed by two trustees? Well, I get a check from principle, but the planned committee directed. There's an administrative process. Yeah, right. It's sort of like a checking count in a bank. You know, the planned committee tells principle, you know, to pay me. It's like writing a check to me, and they refuse to do it. Why didn't you sue? Sue who? I don't know, whoever the hell your boss is. The guy you said shouldn't have. Well, I think the real wrongdoer was PACE. I think your beef was that they didn't accept your advice. Is that right? Well, that's right, but it was more than accepting my advice. I didn't know clients were required to accept their attorney's advice. They're smart if they do. PACE is not my client. PACE is not my client. My client is the planned committees. Who's supposed to pay you? The planned committees pay me from the trust funds. Who holds the trust funds? Well, the planned committee members are also trustees, so it's technically them. All right. Why don't they pay you? Because PACE told Principal not to pay me. PACE acted illegally and told him not to pay me, and they abided by that. And they acted illegally by accepting PACE's advice? Yes. Well, that's an interesting way. By PACE's request. PACE requested them. It'd be just like if I went to your bank and told your bank to stop making monthly payments to the utility company. The bank has no right to listen to me about your account. And? And? I mean, I'm just saying it's the same idea. Neither Principal nor PACE had authority to stop paying my fees. Well, somebody did because they could. The planned committee. The planned committee had the power to stop paying my fees. Now, the advice that I'm talking about. But wait a minute, wait a minute. Maybe I missed something, but if I directed my bank to pay you and my bank stops paying you without my permission, I would cut off my relationship with the bank, not with you. Well, that's what the planned committee should have done. But unfortunately, the planned committee is composed of one PACE planned committee member and a union planned committee member, so the PACE planned committee member wouldn't do anything about it. Who needs Principal? Well, the planned committee has all its funds with Principal. Principal's the middle man. Right. Middle person, we now say. Right. But I didn't give any advice to the planned committees. I tried to collect the debt under the Illinois Pension Code from PACE. That's what I tried to do. And when they wouldn't pay it, I went to the PACE board of directors and told them that they were in violation of the Illinois Pension Code for not paying it. And then eventually, you know, they did pay it. But then PACE attacked me by telling Principal to stop paying my fees. PACE did not have the authority to terminate me. That's why they went to Principal and said stop paying my fees. Well, they had the authority to tell them to stop paying. They didn't have the authority to stop paying them. They did stop paying. They did it, but they didn't have authority to do it, Judge. I'm sorry. Huh? Okay, I know what you're talking about. What fund did Principal pay you from? The trust funds. Principal's a limited trustee. You know, they're like a bank account. They're like the planned committee's bank account. And they shouldn't have. And the planned committee should have taken action against them. But the problem is they don't have a lot of money for, you know, legal fees, et cetera. It's employees' retirement money. They can't get into a big contract fight. And secondly. You're going to run out of time. You've got a minute left in your rebuttal. I've got a minute left? Okay. All right, well, then we'll wrap it up. Thank you very much. May it please the court. The court should affirm the district court's dismissal of Mr. Foster's complaint. I knew you'd open that way. Who hired him? Judge, my understanding is that based on the allegations in the complaint, that he was hired by various planned committees. No. Do you know who hired him? I don't. Do you have any opinion as to who hired him? I don't. It's in the record. There are documents indicating where Mr. These are attached to his complaint, where Mr. Foster is communicating with PACE employees regarding getting paid, as well as there's a Let's go back to the beginning. Who hired him in the beginning? That I don't believe is in the record. There's nothing in the record about this? Except the allegation in the complaint that he has been representing these There really is no allegation in the complaint regarding who hired him. There are in the. No, no. Who fired him? Who fired him? As Mr. Foster very cogently stated, the real wrongdoer here is PACE. That is what he said in argument. That is the case. Our understanding is that, as he repeatedly says in his complaint, PACE unilaterally terminated him. You're only the stakeholder, as I take it. Our principal's understanding was, at the time that PACE issued the instructions to stop paying him, that the termination has been effectuated. That is how the complaint plays out, in that Mr. Foster and PACE have repeated communications. You just stand there saying, why? What am I doing here? Well, Judge, I always appreciate coming to a period before you all, but in a sense, yes. Well, to get back more basically, your client is principal, right? Yes. And my understanding is they hold funds for PACE, right? They hold funds, my understanding, based on the complaint, is that they hold the funds of all the retirement plans, which are for PACE employees, and my understanding is, have been set up by PACE in this structure of different trustee grants. Oh, you do what PACE tells you to do. You pay when PACE tells you to, and you stop paying when PACE tells you to. That is the allegations of this complaint, is that what happened? Well, is it true or not? That is what happened. That's what happens. Taking the allegations of the complaint is true. So it's true. So it isn't just what he said, it is a fact. Judge, outside the record regarding who directs principal to pay or not, I mean, there are minutes in the record where, on certain occasions, the boards of these plans authorized the payment of certain fees to Mr. Foster. Or anybody else. And my understanding is, based on the allegations in the complaint, those funds came from principal. Whether that is actually the case, I don't think we have. The board of the plan is two people, right? Or it's four people. It's equally split between union and employment and the employer, which means a stalemate situation can happen based on the allegations in the complaint, the attached documents. When that happens, it's supposed to go to arbitration to be resolved. That did not happen here, my understanding is. But our take on it is that Mr. Foster is correct in one thing, and that is that the wrongdoer is PACE. PACE came to principal and said stop paying. Principal followed that instruction. The key is that Mr. Foster sued PACE for exactly this same thing, for firing him, for issuing the instructions to principal to stop paying him, and for principals stopping paying him in response to that. They sued PACE. He sued members of the different committees who were PACE employees, and he sued members of PACE management. He settled that claim. He's been paid for this. He now claims that he wasn't fully paid. There is absolutely no support in the record for that. He had his bite at the apple against the person. If you're assuming he hadn't been fully paid, what's your problem? Well, Judge, he's been paid for this under Illinois law, at least the common law. If you sue a tortfeasor and you settle with them and you release them, which he did, that's the end of it. You've been paid for your injury. You don't get to come back later and sue another party who you potentially could have sued earlier on under the same claim and say, well, I want to collect from you too. He's been paid for his injury. Now he says this contribution. How could he collect apart from what PACE owed him? He could have. You. No, I mean, as he said, PACE is the wrongdoer. PACE caused this all by instructing Principal to stop paying. He sued them. That's who he settled with, right? Yeah, and he sued them for literally exactly that, the same thing he's suing Principal for now. And he settled that case and released those claims against all those folks. Well, then somebody else must be holding funds for PACE besides Principal. I don't know the source. You might have had it come from somewhere, I assume. It did, Judge, and I don't know where the funds came from. I think the important part for our purposes is he released those claims. He has been paid for his injury. Under the Illinois Common Law, that's the end of it. It's a single recovery rule, and he claims that the Contribution Act saves him, but under the Illinois Supreme Court case law, it clearly does not apply to attentional tort feasors. You know what is bothering me? You're arguing about the applicability of an Illinois statute about joint tort feasors, an issue that does not appear to have been raised below. You spent three pages of your 41-page brief trying to defend the court's ruling, but the court doesn't even cite, let alone rely on. I mean, what are we to do here? Well, Judge, I think two issues. First of all, we did not argue it below. That is correct. We did raise the fact that the same exact claims were made against PACE earlier. So if you didn't argue it below, how can you argue it up here? Well, Judge, first of all, we're defending the district court's ruling, but also Mr. Foster raised this in his brief. He raised that his settlement of the PACE litigation would not exterminate his claims here. And so, essentially, we are responding to that and saying, actually, that is not the case. Under Illinois law, it does extinguish his claims. He also raised collateral estoppel and issue preclusion, which we agree do not apply here. There was a district court lawsuit by Mr. Foster against Principal, correct? This case, yes, against Principal. What were the allegations that you failed to do? In this case. Yeah. The allegations are that they've essentially, Principal, implemented PACE's instructions to stop paying him. And that is in his suit against PACE, which he settled, and then six months later sued Principal after he settled. He said they had no right to tell you not to pay. Right. He said the exact same thing in the PACE lawsuit. Yeah. I know, but stay with me. He said that your problem was you obeyed your Principal. Right. The Principal should not have listened to PACE when PACE told him to stop paying. That's what he's saying. That's what he's saying. By Principal, I'm using Principal-agency relationship term, not the name. Right. Okay? Right. All right. And so, you know, his settlement bars that claim. You raised that immediately. The settlement barred it. Right. And then, you know, the other issue is, which is the issue that I think the court can affirm on. Were you an indispensable party in the original lawsuit, or original dispute? No. He could have chosen to join Principal in that dispute, but he did not. I think his comment here explains why. This is on PACE. PACE is the one who made, you know, he repeatedly says throughout that PACE took unilateral action. And, you know, I want to kind of dovetail that into what this tort is about. This tort is about a party taking action directed towards a third party that interferes with the plaintiff's relationship with that party. It's tortious interference. Right. Right, Judge. And here, what he's basically saying is that we should not have listened to PACE. And by listening to PACE, that led to. That's your principal. Right. And so, you know, there's simply no allegations. And this was, you know, the thrust of Principal's argument at the district court. There are no allegations that Principal did anything active here to break up this relationship. It did not reach out to the plans and say you ought to fire this guy. It did not reach out to Principal and say you ought to terminate this guy. The termination is completely, as he says, unilateral. The instructions by PACE were issued unilaterally to Principal. That unilateral action is not the stuff of a claim for intentional interference with a prospective economic advantage. And that is the claim that was raised with the district court. It's also not the stuff to say that Principal acted with any sort of wrongful intent here, which is another aspect of the tort.  There's no allegation that Principal intended to harm Mr. Foster or took any action that was intended to harm him. It simply implemented instructions that it was given after PACE had already terminated the relationship. It was over. Now, I know he says they did not have authority to do that, but the effect of it. Why is that any of your business? Exactly. Exactly. Principal was listening to what. What does he say? I'm sorry? You should ignore the people that hired you because they had no right to fire him? You know, I'm not sure, Judge, because he raises a lot of issues under. . . What's your best guess? You know, he raises claims under Illinois law in terms of, you know, there were pension claims we violated, ERISA, but none of that is the substance of his claim before this court. Well, answer Judge Bower's question. Why did you not pay him? Why did we not pay him? Yeah. Based on the allegations in his complaint, it's because PACE had already terminated him and told us that and told Principal not to pay him. Okay. And that is the. . . But he's saying that your act of not paying him resulted in the destruction of his longstanding attorney-client relationship with the playing committees. Life gets complicated, doesn't it? Well, I mean, it's difficult to understand that allegation when he says that before PACE, who he has said is the real wrongdoer here, had already unilaterally terminated that relationship. And now, you know, I understand he says, well, they didn't have authority to do so, but if you look at the exhibits that are attached to his complaint. . . Were you any part of that hiring or hiring with Principal? I mean. . . He wasn't even born. Right. He wasn't even born. Look at him. I was like three. I meant your client, of course. No, no. It had nothing to do with. . . My understanding, Judge, from the allegations in this complaint is that Principal had nothing to do with. . . Does the record disclose that? Not the record. Not who hired him. He says the playing committees hired him, so we have to treat that as true. There's no indication that Principal participated in that. But the firing is something that Principal also didn't participate in. I mean, you look at the letters that are attached to his complaint. Those are between him and Pace. Principal has no involvement whatsoever. And so not only is his client. . . Your answer is. . . Wait a minute. You're the one. . . I'm sorry. What? I'm sorry. You were talking. It's a constant. It is. You're the ones that didn't pay him. You're the ones with the money. You know, under the allegations of the complaint, that's true. But that was done after he was already terminated. So they're really. . . Look, somebody comes to you and says, we terminated this guy as a lawyer. Don't pay him. That seems reasonable. As opposed to, what were they supposed to do? Continue to pay him. But who came to you? It's Pace. And that is. . . No? Or did the plan committee come to you? Based on the allegations in the complaint, which we have to treat as true, it was Pace. It says Pace came to. . . A Pace employee came to a principal employee. So the plan committee didn't. And what he's saying is only the plan committee could. That is what he is saying. And whether that forms the basis for some sort of federal ERISA or state pension law claim, I don't know, because he didn't bring any of those. He brought an intentional interference with prospective economic advantage claim, which has specific requirements. That principal, in this case, took action towards the plans, or Pace even, to cause them to break up the relationship. By the time principal implemented the instructions, the relationship was over. Principal Pace had terminated it. And so the principal did nothing. They didn't try to influence the plans. They didn't say you should go with somebody else, which is the common case here. I know, but do you know who has to tell you not to pay someone? In other words, is it Pace or is it the plan committee that has to tell you, principal? Treating his allegations as true, it had to come from the plan committee. And it did not. It did not. That is correct. So should he win? No. Why? Because that's not an intentional interference with prospective economic advantage claim, which is the only claim that he brought here. Can I fire someone that I have no right to fire? No. So? But that doesn't mean the claim against you is for interference with that prospective economic advantage that that person had. Well, in the court's order, it says that the principal maintained this decision even after June 23 when Foster produced signed statements from the union representative on the Pace plan committee confirming that they did not authorize the decision to stop payments to Foster. Right. So that's after Pace had already terminated the relationship. But if Pace didn't have the right to terminate, you know, this is so Alice in Wonderland. And I'm the rabbit. Annette, the judge is, unless there's any other questions, I know, run away. I think I can quickly wrap this up. Judge, you're exactly right. Let me, in my apposition brief, I quoted a resolution from one of the plan. Pace Northwest plan resolution on 2203. Page ID. There was a discussion on a fixed fee contract for Foster. In 2001, there was approximately $21,000 in fees. But 2002 was slightly over $15,000. Trustee Joswiak made a motion for a fixed fee of $15,000 for 2003, plus any hardship charges, which are now charged. The motion was seconded by Trustee Bandekara. Motion carried. The plan committee hired me. The plan committee hired principal. The only one who has authority to stop my fees is the plan committee. Did you get paid? I did not get paid because principal wouldn't pay me. And for principal to stay up to say that that is a tortuous interference with an attorney-client relation to stop you from being paid for 17 months, that's just absurd. What I would also like to do is, you know, they talked about the settlement issue. Well, the judge raised the settlement agreement as resolving this. And I raised in my brief the Illinois statute. When a release or covenant not to sue or not to enforce is given in good faith to one or more persons liable in tort arising out of the same injury, it does not discharge any of the other tort feasors from liability for the so provide. But it reduces the recovery on any claim against others to the extent of any amount stated in the release or the covenant. And he raised the argument that the common law rule still applies to intentional tort feasors, and that's absolutely false. I have the Supreme Court case, Thornton v. Garcia, that applied the rule to an intentional tort feasor. So, oh, we're done. Okay. Could I just read one more thing? Sure, go ahead. Okay, here. I wanted just to give you a flavor of how the plan committee works. Pace Southwest Division, ATU Local 1561-401K Plan. Section 1001, Powers and Duties. The plan administrator shall be responsible for the management, operation, and administration of the plan. In addition to the powers, rights, and duties set forth elsewhere herein, the plan administrator shall employ or retain agents, attorneys, actuaries, accountants, or other persons. Administrative committee. A committee to be known as the administrative committee shall be established and shall act as plan administrator. The administrative committee shall consist of two members. One member shall be by the employer, appointed by the employer. One member shall be employed by the union. Members of the administrative shall serve without. Each member may also have an alternate. Action by the committee shall require the signature of each member or his alternate. Okay. That's exactly how it works. Thank you very much. Thank you. Thanks to both counsel, I think. Mike. Mike. Could we take a break? Yeah. There will be a short break before we take up the next case.